Filed 3/19/26  In re Zachary R. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re Zachary R., a Person Coming Under the Juvenile Court Law. | B345349 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>Jason R.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No.24CCJP03710A) |

APPEAL from orders of the Superior Court of Los Angeles County.  Mary E. Kelly, Judge.  Affirmed.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Kelly G. Emling, Deputy County Counsel, for Plaintiff and Respondent.

————————————

Jason R. (Father) appeals from the juvenile court's detention and dispositional orders.  We conclude that Father's challenge to the detention order is moot, substantial evidence supports the juvenile court's jurisdictional order regarding Father, and Father presents no Fourteenth Amendment violation.  Finally, Father fails to establish that the trial court was compelled to remove the child from Kristen M. (Mother).  We affirm.

## BACKGROUND

### 1. The family and related superior court cases

Father and Mother are no longer together, and they have identical twin children.  Zachary R. is the only child subject to this appeal, and he was 16 years old when the juvenile court asserted jurisdiction.  Zachary experienced psychosis and catatonia, both life threatening conditions, when the case came before the juvenile court.  In addition to the dependency case involving Zachary, the family was simultaneously involved in mental health court and family court cases, which affected parental custody and medical authority to direct Zachary's care.

On May 30, 2024, Judge Maria Cavalluzzi of the mental health court granted the request of Resnick Neuropsychiatric Hospital at the University of California, Los Angeles (UCLA) for an order for electroconvulsive therapy (ECT) for Zachary.  Then on July 11, 2024, Judge Cavalluzzi granted an order for additional ECT treatment for Zachary.  One month later, Judge Cavalluzzi again granted UCLA's request for more ECT treatments for Zachary.

On August 30, 2024, Commissioner Marilyn Mordetzky, presiding in family court, ordered Zachary released to Father's custody upon his departure from UCLA hospital.  On September

6, 2024, Commissioner Mordetzky ordered Mother and Father to share legal custody of Zachary. On October 2, 2024, the family court found no exigent circumstances and denied Mother's request to change Zachary's custody. On October 31, 2024, Commissioner Mordetzky ordered, "Dr. Yu is to continue to treat [Zachary]. Both parents are to comply with Dr. Yu's treating protocol and recommendations." Dr. Kwi Yun Yu was a psychiatrist treating Zachary, and she was not affiliated with UCLA.

On November 20, 2024, the family court again denied Mother's request for custody of Zachary. Moreover, the family court order directed that if Mother violated the October 31, 2024 order, Father was to have tie-breaking power with authority to follow Dr. Yu's medical plan without Mother's consent.

**2.** **The detention report and detention hearing**

On October 17, 2024, the Department of Children and Family Services (DCFS) received a referral stating that Zachary was missing ECT appointments and in danger of becoming gravely disabled. The reporting party was concerned that Zachary may need to be readmitted to a hospital.

Soon after, DCFS interviewed Father. Father stated he understood the importance of taking Zachary to the doctor, and that Zachary missed three ECT appointments because Zachary did not want to go. Father denied preventing Mother from helping with Zachary's medical issues, and noted he worked closely with the ECT team. Father said he initially had medical custody of Zachary, but Mother and UCLA made false accusations against him. Father also said that UCLA was bullying him. He noted that Dr. Yu was well-informed, and Dr. Yu would be changing Zachary's medication.

DCFS also interviewed Mother. Mother indicated that Father did not consent to medication and ECT treatments for Zachary. Father changed all of the protocols for Zachary, and Zachary was decomposing, not eating, not speaking, and not using the restroom. In addition, Zachary was placed on a psychiatric hold because he was attacking the people around him. Mother further said Zachary had not been doing well after his discharge to Father. In contrast, Mother said Zachary had been doing well while in the hospital. She also said that Father generally did not allow her to see Zachary.

Thereafter, Colleen McCord, UCLA Associate Chief Clinical Social Worker, reported that Father does not understand the severity of Zachary's health condition. She stated that Zachary was hospitalized because he was decomposing. McCord elaborated, saying Father canceled appointments and did not understand the harm to Zachary from missing appointments. She stated the ECT treatments were important to keep Zachary stable. McCord said Father believed Zachary did not need the treatment and declined a behavioral therapist in his home. When Zachary was hospitalized, Father refused treatments and refused to give consent for Zachary's medical needs. Zachary improved once Father finally consented to treatment at UCLA. She said Zachary had severe psychosis, and there was a court order regarding the treatments, but Father was not following it. McCord also noted tension with the parents as Dr. Yu changed Zachary's medications, but Mother did not agree with the changes.

On October 25, 2024, DCFS attempted to talk to Zachary at school, but he declined to talk while raising his arms and making a fist.

4

That same day, DCFS spoke to the school principal. She said Zachary's medical situation was the most serious she had seen in her 30 years of work. The school principal indicated that it appeared that ECT treatments stabilized Zachary. In addition, Father was having issues with Zachary's medication, and the parents could not agree on a treatment plan. Father also told the principal he was seeking a new treatment plan with Dr. Yu.

On October 28, 2024, Regional Center coordinator Tania Viana said she had been working with the family and had safety concerns for Zachary. Viana was concerned Zachary would have to be hospitalized because Father kept canceling medical appointments. In contrast, Viana did not have similar concerns about Mother. The parents shared custody over Zachary, but Father denied Mother access to assist with Zachary. In addition, Viana indicated Zachary received services from multiple programs. However, Father was not complying with the appointments, which compromised the programs. She also noted that Father had access to extensive in-home services including daycare from 6:00 a.m. to 8:00 p.m., but he would cancel the assistance, claiming there were too many people in his home.

DCFS also spoke to Danielle Kelly, an outpatient mental health advocate. Kelly said that Father contacted her to ask about the law and his rights regarding Zachary. Kelly stated that Zachary does not want to go to his ECT appointments, Zachary has the right to decline, and Zachary can choose his doctor. She also stated that UCLA has no jurisdiction after Zachary leaves UCLA hospital, and that Dr. Yu can overrule UCLA. Kelly said there was no neglect, and she believed Father was just advocating for his child.

DCFS spoke to Caitlin Lehmann who provided voluntary in-home services to Zachary as a part of a state-funded program. She had no safety concerns that Zachary was at risk of harm.

DCFS spoke to Cristal Butler Miles, a supervisor from a service provider that assisted Zachary with his medication in the family home. She said Father only canceled medication when the child went to an ECT appointment. Butler Miles stated she had no concern that Father's or Mother's custody put Zachary at risk of harm.

DCFS spoke with Marilyn Alvarado-Trevino who provided applied behavioral analysis training to Zachary in-home. She said Father did not show any resistance to the training. Father told her there were a lot of people coming in and out of his home, and he preferred the training via Zoom. She said Father's custody of Zachary presented no safety concerns for Zachary.

On November 14, 2024, a DCFS social worker spoke with the DCFS medical director. The DCFS medical director stated that Father is not supportive of UCLA's treatment for Zachary. In contrast, the DCFS medical director said that Mother understood the importance of the treatment and was supportive.

On November 19, 2024, DCFS spoke with Dr. Jenny Nguyen, a UCLA psychiatric doctor who had been treating Zachary for a year. Dr. Nguyen stated that Zachary was admitted to UCLA hospital because he experienced psychosis and catatonia. In an earlier letter, Dr. Nguyen explained that psychosis and catatonia are both life-threatening conditions. She also noted that ECT stabilized Zachary. With ECT, Zachary was able to eat, take oral medication, and say a few sentences. Dr. Nguyen spoke to Dr. Yu to provide outpatient recommendations. Dr. Yu told Dr. Nguyen that Zachary had

bipolar disorder and had no need for ECT, and Dr. Yu changed his medications. Dr. Nguyen said that her team had informed Dr. Nguyen that Father did not want ECT or the new medications. She stated Father failed to appreciate the severity of Zachary's health issues and that Zachary lacked the capacity to make his own decisions. In contrast, Dr. Nguyen did not have any concern regarding Mother's ability to care for Zachary. Because of UCLA's concerns regarding Zachary, UCLA filed a case in mental health court asking for the court to order Zachary to receive ECT.

As noted above, on November 20, 2024, Mother informed DCFS that the family court judge denied her request for sole custody of Zachary.

The next day, on November 21, 2024, DCFS served Father with a warrant for Zachary's removal.

In support of Father's opposition to DCFS's request to detain Zachary from him, Dr. Yu submitted a declaration. There, Dr. Yu indicated that Father consistently complied with Zachary's treatment plan. Dr. Yu concluded that Zachary missed ECT appointments because of Zachary's behavior and not because of Father. Dr. Yu stated she agreed with UCLA's clinical recommendation for ECT, but disagreed with UCLA's decision to treat Zachary with loxapine. Dr. Yu accused UCLA staff of making false representations. In summary, Dr. Yu concluded, "I firmly believe that there is no evidence to support the claim that [Father] neglected or endangered his son."

On December 11, 2024, the trial court detained Zachary from Father. The juvenile court granted Father unmonitored visits while Zachary was at UCLA hospital. The court ordered

Zachary not to be removed from UCLA hospital without further court order unless he was medically released.

### 3. The jurisdictional report

At the time of the jurisdictional report, Zachary resided with Mother. On January 2, 2025, DCFS attempted to interview Zachary for the jurisdictional report, but Zachary refused to answer any questions.

In speaking with DCFS, Father denied the allegations in the petition. He indicated Zachary did not attend his ECT appointments for two weeks because Zachary did not want to go. Father said Mother was aware that Zachary was not going to his ECT appointments. Father reported speaking to Dr. Yu about Zachary's refusal to go to his appointments. He said, "I did everything I could to get [Zachary] to go to his appointments." He also described an incident where Mother was driving Zachary to an appointment and Zachary exited Mother's moving car. He said that when DCFS came to his house to remove Zachary, he and Zachary were returning from seeing Dr. Yu. He reiterated, "[M]y son was not in a life-threatening situation." Father also stated that he wanted Zachary to return to his home and that he was doing a "tremendous job" taking care of his son. He indicated that he took Zachary's medical appointments seriously and that nothing was more important to him than Zachary's well-being. Father also said he followed the recommendations of doctors and therapists including Dr. Yu. He also noted that Zachary was hospitalized after he lived with Mother in early December 2024.

In January 2025, Mother reported that neither Father nor Zachary wanted to go to ECT appointments. Mother said she twice went to Father's home to help Zachary attend his

appointments.  The first time, Zachary kicked her, and she left because Zachary refused to go to his appointment.  The second time, Zachary would not go with Father, but Zachary was willing to go in Mother's car.  Zachary was in psychosis, started shouting, and attempted to open the door while the car was moving.  She stopped the car, and Zachary exited the car to run in the opposite direction.  After that incident, the doctor's office refused to provide Zachary with ECT appointments because he continued to miss them.  Prior to the jurisdictional hearing, Mother said she took Zachary to the hospital because he was in psychosis and had increased catatonic symptoms.  He also punched Mother, a service provider, and a television.

On January 7, 2025, DCFS spoke with Royal Wade who was in Father's home six to seven days a week from 6:00 a.m. to 7:00 p.m. to provide services.  Wade stated that Zachary did not want to go to his ECT appointments, and Father attempted to encourage Zachary to attend by telling him that they could go for a hike or get food.  Wade arrived at Father's home at 6:00 a.m., but Wade could not get Zachary to attend ECT appointments.  UCLA staff also spoke to Zachary to encourage him to attend the appointments.  Wade also said that Mother attempted to help, but she would trigger Zachary, causing Zachary to lock his door.  Wade also recounted the incident where Zachary got out of Mother's car on the way to an ECT appointment.  According to Wade, the car was moving when Zachary exited.  On another occasion, Zachary ran out of an elevator door on the way to an ECT appointment and ran into traffic.  Zachary also punched Wade and a psychiatrist that day.  When Zachary heard the word "ECT," he would become resistant.

9

DCFS also spoke with Olivia Marshall, a member of UCLA's ECT staff. Marshall described multiple ECT appointments where Zachary refused to attend. She said that Mother indicated that Zachary got out of a moving vehicle on his way to one visit. According to Marshall, Dr. Yu changed Zachary's medication without consulting with the UCLA team. Marshall also noted that Zachary's behavior was dangerous to staff.

In making its final assessment in the jurisdictional report, DCFS concluded that the allegations that Father failed to protect Zachary were "not true" based on interviews with parents, service providers, and medical staff. The social workers signed the report on January 7, 2025.

Thereafter, on January 21, 2025, DCFS filed a first amended petition that included the previously pled allegation that Father medically neglected Zachary. In addition, DCFS newly alleged that both Mother and Father placed Zachary in a detrimental situation because the parents could not agree on a mental health treatment program.

The same day DCFS filed its amended petition, it also filed a last minute report. There, Dr. Yu again stated that Father followed her medical recommendations. She also said that Father went "above and beyond" to get Zachary to his ECT appointments.

In the same last minute report, in a section labeled as "concerns for Zachary," DCFS noted that Zachary remained hospitalized at UCLA and he would not be released until Father agreed to a treatment plan including an outpatient psychiatrist recommended by UCLA. As before, Father wanted Zachary to "have a say" in his treatment plan, and Father also wanted "his

own say." As a result, Mother agreed to UCLA's suggested plan, but Father did not. DCFS noted that Zachary had been hospitalized three times, with the latest hospitalization beginning on December 1, 2024.

DCFS filed another last minute report on February 5, 2025, which stated that UCLA's emergency department placed a hold on Zachary because UCLA deemed him gravely disabled while being a danger to himself and others. During this hospitalization, Zachary punched a behavioral therapist, punched the television, and drove a pen into his forearm, saying that voices directed his acts. The DCFS report concluded that medication changes and parental conflict triggered Zachary's earlier hospitalization. In addition, service providers expressed concerns about whether the parents could agree on an outpatient psychiatrist for Zachary.

On February 7, 2025, DCFS reported that Mother and Father agreed to a psychiatrist for Zachary. DCFS also recommended that Zachary be returned to Mother's home.

On February 7, 2025, although the trial court did not conduct the jurisdictional hearing at that time, the court ordered Zachary released to both parents under DCFS supervision.

On February 10, 2025, DCFS filed another last minute report indicating Father did not agree to Zachary being released to Mother. Therefore, the juvenile court held a hearing to address the dispute and ordered that Zachary was to spend the first weekend with Mother because the services were already in place in Mother's home and ordered the parents to establish a shared custody agreement. DCFS did an unannounced visit in Mother's home the first weekend and noted no concerns. DCFS

11

also noted that the Regional Center would need about two weeks for services to start in Father's home.

On February 21, 2025, DCFS filed another last minute report. There, DCFS noted that Zachary was spending alternating weeks with his parents. Mother stated that Zachary struck her in the face and knocked her down in February. On another occasion, Zachary punched her on her back and shoulder. When a service provider intervened, Zachary hit her in the chest. Nonetheless, Mother and Zachary went to an ECT appointment. According to both Father and a service provider, Zachary was calmer in Father's home. In the report, DCFS recommended the case be dismissed.

The jurisdictional and dispositional hearing was held on February 25, 2025. Although DCFS's report asked the juvenile court to dismiss the allegations, DCFS argued at the hearing in favor of jurisdiction on both counts in the amended petition. The juvenile court found jurisdiction based on (1) Father's medical neglect of Zachary and (2) Mother and Father's inability to agree on a treatment plan for Zachary while amending some of the language in the petition. Regarding Father's medical neglect, the trial court explained its reasoning. "There is medical evidence that has been proven that the child was in a catatonic state." "The psychosis needed to be dealt with. And documenting a response to lithium, and taking him off of all of his antipsychotics made him psychotic and catatonic." "And there were so many doctors [indicating that] E.C.T. was the treatment plan. Yet Father refused to implement it without a court order. You can't wait for [an] order all the time."

Regarding disposition, the trial court explained, "My order stands. It is 50-50 custody . . . I am not going to have an

12

advantage for one parent over another." The minute order provides, "The Court orders the child released to the home of parents."

## DISCUSSION

Father makes four arguments in his appeal. First, he contends the juvenile court erred in detaining Zachary from him at the outset of the case. Second, he contends the court erred in asserting jurisdiction regarding the allegations against him. Third, he asserts that the court erred in ordering joint custody of Zachary at disposition. Fourth, he argues the disposition order violated his Fourteenth Amendment rights. We find no merit to his arguments and affirm the trial court's rulings.

## 1. The trial court's detention findings are moot

Father contends there was no basis for the juvenile court to make emergency detention orders at the outset of the case and to detain Zachary from him. However, we agree with our colleagues in Division Two that a dispositional order moots a previous detention order. (*In re Julien H.* (2016) 3 Cal.App.5th 1084, 1088, fn. 7.) Here, while the trial court issued a preliminary order detaining Zachary from Father, the trial court returned Zachary to Father's custody before the dispositional hearing. At the dispositional hearing, the trial court ordered that Zachary was to remain in Father's care. Thus, we can offer no meaningful relief to the initial detention order, as Father already has received the only relief we could provide, return of Zachary to his care. (*In re D.P.* (2023) 14 Cal.5th 266, 276.) This issue is moot. (*Ibid.*)

To argue we should reach the merits, Father points to authority establishing that detention rulings are appealable, citing to *In re B.P.* (2020) 49 Cal.App.5th 886, 889, and *In re Javier G.* (2005) 130 Cal.App.4th 1195, 1200. While we agree

13

that detention orders become appealable with the judgment, these cases do not address whether detention rulings can be mooted by later dispositional findings. Father also points to *In re M.C.* (2023) 88 Cal.App.5th 137, 148–150, where our colleagues in Division Two addressed both a detention order and a dispositional removal order where the juvenile court both detained a child from a parent and later removed the child from the same parent at disposition. (*Ibid*.) Father argues that *In re M.C.* could not have considered whether the detention order was appropriate without first ruling that it was not moot. While there is some logic to Father's argument, *In re M.C.* does not address mootness, and thus, we conclude it is not authority for an issue that was not considered. (*McConnell v. Advantest America, Inc.* (2023) 92 Cal.App.5th 596, 611.) Regardless, we conclude the dispositional ruling returning Zachary to Father's care moots the earlier detention order. (*In re Julien H.*, *supra*, 3 Cal.App.5th at p. 1088, fn. 7.)

2. **The trial court's medical neglect finding against Father is supported by substantial evidence**

To assert jurisdiction here, the juvenile court must conclude that "there is a substantial risk that the child will suffer, serious physical harm or illness" from "[t]he willful or negligent failure of the parent or guardian to provide the child with adequate . . . medical treatment." (Welf. & Inst. Code, § 300, subd. (b)(1)(C).) We review a trial court's jurisdictional findings for substantial evidence. (*In re R.C.* (2012) 210 Cal.App.4th 930, 941.)

Here, there is substantial evidence in the record to support the trial court's finding that Father medically neglected Zachary. Over the summer and fall of 2024, UCLA went to mental health

14

court three times to secure rulings ordering potentially life-saving ECT for Zachary. There is evidence in the record that Father opposed the treatment. In October 2024, a clinical social worker concluded that Father did not understand the severity of Zachary's health condition, and noted that Father stated that Zachary did not need ECT. A UCLA doctor also communicated that the UCLA hospital team concluded that Father did not want ECT treatments or new medications, and that Father did not appreciate the severity of Zachary's health issues. Father also initially declined to give consent for necessary treatments when Zachary was hospitalized in October 2024. Moreover, after Zachary's third hospitalization in the days before the jurisdictional hearing, Father delayed consenting to a treatment plan to secure Zachary an outpatient psychiatrist before eventually agreeing. Finally, Zachary had intensive, immediate medical needs, and we must evaluate whether Father presented a risk to Zachary given those serious medical conditions. Thus, we find substantial evidence supports the juvenile court's assertion of jurisdiction.

On appeal, Father points to evidence in the record suggesting that he attempted to ensure that Zachary was attending his medical appointments after the mental health court orders. Father also points to the family law orders granting Father physical custody of Zachary and refusing to interrupt his custody. Father even points to DCFS's own report concluding that the medical neglect allegation against Father should be dismissed. While there certainly is competing evidence in the record, the juvenile court is the fact finder. The juvenile court was free to place weight on the evidence that Father was an obstacle to Zachary receiving life-saving treatment, and it is not

15

our role to second guess these factual determinations. (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Because we find the medical neglect allegation is supported by substantial evidence, we affirm the jurisdictional finding on this basis and decline to reach the additional jurisdictional finding regarding Father's inability to attend to Zachary's medical needs based on his conflicts with Mother. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

## 3. The trial court did not err in releasing Zachary to both parents

Father challenges the order granting parents joint legal custody and essentially asserts the child should have been removed from Mother. In order to remove a child from a parent's home, a trial court must find clear and convincing evidence there "would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home" and no "reasonable means" exist to protect the child without removal. (Welf. & Inst. Code, § 361, subd. (c)(1).)

Here, Father asserts that the trial court should have removed Zachary from Mother and granted him sole custody. In this context, as the party with the burden in trial court to establish that Zachary should have been removed from Mother, Father must show that the evidence in the record compels a finding in his favor on appeal. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, overruled on other grounds as stated in *Conservatorship of O.B.* (2020) 9 Cal.5th 989.)

Father does not even attempt to meet this standard as he merely argues "substantial evidence shows [Zachary] could be seriously harmed if returned to Mother's care." Regardless, the

evidence does not compel a finding against Mother. Here, there is evidence in the record that Mother supported ECT treatment for Zachary over the summer and fall of 2024, that Mother took Zachary into her home prior to the dispositional hearing, that Mother attempted to assist Zachary in attending his ECT appointments when Zachary lived with Father, and that Mother selected an appropriate outpatient treatment plan prior to disposition. Thus, Father falls far short of carrying his burden that the evidence compelled the trial court to remove Zachary from Mother.

4.      **Father presents no constitutional violation**

Father also claims the dispositional order violated his Fourteenth Amendment parental rights. He argues, "there was no substantial danger to [Zachary] at the time of disposition. Moreover, there were reasonable means short of removal that were clearly available." However, the juvenile court did not remove Zachary from Father at the disposition. The court simply ordered that the parents were to share custody.

Similarly, the court did not take away Father's right to make medical decisions for Zachary at the disposition. Rather, the court ordered that the parents were to share custody and decisionmaking. Nonetheless, Father complains that the trial court improperly overrode his parental "decision-making rights" because according to Father, "[t]he record contains no evidence that Father failed or refused to follow medical guidance." It appears that Father merely re-argues his theory that the trial court should not have exercised jurisdiction, but as we note above, the record supports the juvenile court's jurisdictional orders. Finally, in his reply, Father appears to argue that the emergency detention at the outset of this case violated his

17

Fourteenth Amendment rights, but we decline to address this argument as Father did not raise it in his opening brief.

Thus, this claim fails.

## DISPOSITION

The juvenile court's jurisdictional and dispositional orders are affirmed.

VIRAMONTES, P. J.

WE CONCUR:

WILEY, J.

SCHERB, J.